IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 5, 2017

## JOHN VALENTINE v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 11-02890      Carolyn W. Blackett, Judge**

_____

### No. W2017-00161-CCA-R3-PC
_____

The petitioner, John Valentine, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received effective assistance of counsel at trial. After our review of the record, briefs, and applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

John Scott, Memphis, Tennessee, for the appellant, John Valentine.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Amy P. Weirich, District Attorney General; and Paul Goodman, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

#### *Facts and Procedural History*

#### A.      Trial Proceedings and Direct Appeal

In 2013, a Shelby County Criminal Court jury convicted the petitioner of rape of a child and aggravated sexual battery for which he received an effective sentence of thirty-three years. On appeal, this Court affirmed the petitioner's convictions. *State v. John Valentine*, No. W2013-01002-CCA-R3-CD, 2014 WL 4792801, at *1 (Tenn. Crim. App. Sept. 25, 2014), *perm. app. denied* (Tenn. Jan. 20, 2015). The Court summarized the facts, as follows:

This case arose from the [petitioner's] convictions for rape of a child and aggravated sexual battery. According to the proof at trial, the [petitioner] penetrated the victim with his penis and forced the victim to masturbate him.

Audrean Bond-Jones was the principal at Bethel Grove Elementary School in November of 2010, where the victim was a first-grade student. On November 17, 2010, the victim was brought to Ms. Bond-Jones' office for inappropriate behavior towards another student. While in line in the cafeteria, the victim was "hunching" on another student. The victim placed the front part of her body against the back of another student and "would just do a little front back motion." Ms. Bond-Jones testified that the victim "shared quite a bit of information about some things" that occurred in her home. When the victim spoke about certain sex acts, Ms. Bond-Jones asked her where she learned about the acts, and the victim "began to demonstrate . . . what her experiences were with her father." In response to the victim's statements, Ms. Bond-Jones called the Department of Children's Services ("DCS"), and law enforcement officers came to the school.

Marion Woods had been the victim's foster mother since the end of November 2010. Ms. Woods was a teacher and testified that the victim's performance in school was somewhat deficient. She indicated that the victim sometimes struggled with the concepts of dates and times, as the victim might say that she was with her mother or sister the previous evening when she actually was with Ms. Woods. Ms. Woods testified that the victim's accounts of her interactions with the [petitioner] remained consistent.

Angelique Roshea Horace was a foster care counselor with Youth Villages and served as the victim's foster care counselor. She worked with the victim on developing "social skills[,]" such as communication, listening skills, and "making friends." Ms. Horace's overall goal with counseling was to assist the victim and Ms. Woods in achieving the victim's permanency goal of adoption. Ms. Horace testified that when the victim was nervous, she would giggle, place her hands in front of her face, and lower her head.

The victim testified that she was currently ten years old and in the third grade. She stated that her father's name was "[t]ighten up" and that she had seen him when she went to bed on the evening before she spoke with Ms. Bond-Jones. The victim slept in the same room as her mother and

the [petitioner]. On the evening of the incident, the victim was asleep in a bed with her mother and the [petitioner], and she awoke to see the [petitioner] "feeling on" her mother. The [petitioner] then touched the victim's front private part with his penis. He placed his penis inside her front private part and moved "in a circle[,]" and the victim testified that it "[h]urt." The [petitioner] also placed his penis inside the victim's bottom, and the victim testified that "[i]t hurt when it [was] in me." He touched her breast private part, and the victim testified that "[w]hen he touched it, it hurt me. He touched it and I feel [sic] uncomfortable." The [petitioner] told the victim to touch his penis with her hand, and he placed her hand on his penis. The victim demonstrated for the jury how the touching occurred. The victim "told [the [petitioner]] to stop, but he didn't stop." The victim testified that she could feel "pee" come out of the [petitioner]'s penis. She stated that the penetration only occurred one time and that it was on the same night that she placed her hand on the [petitioner]'s penis. The victim recalled telling Ms. Bond-Jones the next day that her "hand was smell [sic] like pee[,]" and the victim believed it was because her hand was on the [petitioner]'s penis.

Mary Daley, a pediatric nurse practitioner, performed a sexual assault examination on the victim. Ms. Daley acknowledged that there was some confusion in her report as to the date of the assault. The victim told Ms. Daley that the assault occurred the night before the exam, but the victim's mother said that the assault occurred the week before the exam. Ms. Daley also wrote on her report that the victim stated that "Daddy stuck his stuff up my booty last night, then he peed on my hands." The victim told Ms. Daley that she got into trouble at school when she "[a]ccidentally freaked" another student. The victim demonstrated to Ms. Daley that "freaking" meant forward pelvic thrusts against another person.

When Ms. Daley examined the victim, she noticed that the victim had "two very, very red deep scratched areas around the perihymeneal area." The tissue around the hymen was very bright red and "extremely tender" during the exam. She stated that there were no tears or abrasions on the hymen itself. She noticed "fairly deep" scratch marks on the victim's external genitalia area. Ms. Daley also observed a bruised area between the victim's "front private and her back private." Several photographs of these injuries were shown to the jury.

The first photograph depicted the victim's external genital area. Ms. Daley identified five scratches on the genital area that she noted as abnormal during the exam. She testified that the scratches were "fairly

- 3 -

deep" and had grooves that were deeper than a normal scratch of the skin would be. The second photograph showed the victim's internal genitalia and illustrated a "deep[,] dark grooved area" on the perihymenal band. The third photograph was of the victim's annular hymen, where a darkened area was visible on the right side. The fourth photograph showed several scratches, redness, and part of the hymen wall. The fifth photograph depicted the scratch marks and the deep red coloration on either side of the hymen and illustrated a small area of bruising. The sixth photograph again showed the redness around the hymen and showed a darker area. Ms. Daley opined that the area was darkened due to a bruise. The seventh photograph showed scratch areas with a "deep bloody looking groove," irritation, and a darkened area. The eighth photograph showed the victim's anal opening, and Ms. Daley testified that it appeared "normal[,]" as there were no tears or fissures. The eighth photograph also depicted the area earlier described as bruised and the perineal area. The ninth photograph showed the victim's anal opening. Ms. Daley testified that the darkened area was visible, and there appeared to be bruising between her front private and back private.

Ms. Daley classified the victim's injuries as "indeterminate," as "[i]ndeterminate physical examination findings may support the patient's disclosure of abuse." She testified that "indeterminate" was used to categorize something "not normally seen on a regular, normal, physical exam." Ms. Daley stated that the scratches and bruises on the victim's perihymeneal area, the small external bruise area, and the small, bruised area directly behind the vaginal area were not normally present during an exam. She testified that her findings were consistent with the victim's statement that "Daddy put his stuff up my booty," as children do not always understand the concept of a vaginal opening. She testified that nothing in the victim's physical history indicated that there had ever been any kind of injury in the genital area that would have left the marks that she observed. She agreed that whether the time frame of the abuse was a day or a week before the exam, her findings were still consistent with the victim's disclosure of abuse.

Letitia Cole was a forensic interviewer with the Memphis Child Advocacy Center who conducted a forensic interview with the victim. She testified that during the interview, the victim made an "active disclosure" of abuse using both anatomical drawings and anatomical dolls. She stated that an "active disclosure" was a full disclosure made by a victim during a

forensic interview. A video recording of the victim's interview was then played in open court.

Lieutenant Carl J. Ray was a sergeant in the Memphis Police Department's juvenile squad for sex crimes and child abuse cases at the time of the incident. He interviewed the [petitioner], who voluntarily gave a statement after waiving his *Miranda* rights. The [petitioner] told police that his favorite saying was "tighten up." He stated that the victim's mother placed the victim in bed with her and the [petitioner]. As the [petitioner] and the victim's mother "got intimate," he asked her, "Why not put [the victim] on a pallet or something[,]" and she replied that the victim would "be alright." He stated that the victim awoke while he and the victim's mother were "making love" and that the victim's mother was shocked when the victim awoke. He said that he briefly had sex with the victim's mother but that "she was not into it" because she had cancer and sexual intercourse "burn[ed]" for her.

Once the victim's mother told the [petitioner] to stop, he "turned over and lay [sic] behind [the victim's mother] for a little while." The victim then awoke, "stretched her arms out backwards where [the [petitioner]] was at," felt his penis, and "started playing with it." The [petitioner] stated that the victim was "jacking [him] off" while lying in bed with him and her mother. He said he ejaculated after about "five minutes" and that some of the ejaculate landed on him. He was not sure if any landed on the victim. The [petitioner] stated that he had never done anything like that before and that it was the only time he permitted the victim to masturbate him. He did not tell the victim to stop.

The jury found the [petitioner] guilty of rape of a child and aggravated sexual battery. The trial judge sentenced him to an effective term of thirty-three years. The [petitioner] filed a timely notice of appeal, and we proceed to consider his claims.

*Id*. at *1-4.

## B.    Post-Conviction Proceedings

At the outset of the post-conviction hearing, the petitioner was voir dired by post-conviction counsel. During questioning, the petitioner informed the post-conviction court that he was proceeding with only two of his claims, (1) counsel was ineffective for failing to conduct an independent investigation and (2) counsel was ineffective for failing to

have the petitioner evaluated. The petitioner also informed the post-conviction court that he would not be testifying and his only witness would be trial counsel.

Trial counsel, the only witness called during the hearing, testified he represented the petitioner between 2011-2013, taking the petitioner's case from general sessions court and through trial. According to trial counsel, he met with the petitioner several times and reviewed discovery and the State's theory of the case with the petitioner. Furthermore, trial counsel stated that he regularly met with the assistant district attorney (ADA) to discuss the petitioner's case and would then share those discussions with the petitioner. Trial counsel also had two meetings with members of the petitioner's family. When questioned about why he did not seek funds to and hire an investigator, trial counsel explained that, based on his review of the State's case including his meetings with the ADA, he did not think an investigator "would get anywhere" or produce any further information concerning the petitioner's case. Trial counsel was also questioned as to why he did not hire an expert to challenge the testimony of Ms. Daley, the nurse practitioner who examined the victim. In response, trial counsel stated that he did not see the need for an expert and believed he could cover what he needed during his cross-examination of Ms. Daley.

On cross-examination, trial counsel also explained that he did not have a mental evaluation performed on the petitioner because competency was never an issue. Finally, trial counsel testified he had been practicing criminal law for twelve years and one-hundred percent of his cases were criminal defense in either state or federal court.

After taking the petitioner's claims under advisement, the post-conviction court found the petitioner failed to prove ineffective assistance of counsel and denied relief. This timely appeal followed.

### *Analysis*

On appeal, the petitioner asserts the trial court erred in denying his petition for post-conviction relief, alleging trial counsel failed to conduct an independent investigation and, therefore, did not locate "a potentially exonerating witness;" failed to hire an expert to rebut the State's medical proof; and failed "to have [the petitioner] examined to ensure that he was competent to stand trial." The State asserts the petitioner failed to present clear and convincing evidence demonstrating trial counsel was deficient or how his alleged deficiency prejudiced his trial. Upon our review, we agree with the State.

To obtain relief in a post-conviction proceeding, a petitioner must demonstrate that his or her "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The post-conviction petitioner bears the burden of proving his allegations of fact by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-110(f). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009)).

Appellate courts do not reassess the trial court's determination of the credibility of witnesses. *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009) (citing *R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008)). Assessing the credibility of witnesses is a matter entrusted to the trial judge as the trier of fact. *R.D.S.*, 245 S.W.3d at 362 (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. *See Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001); *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and article I, section 9 of the Tennessee Constitution both require that criminal defendants receive effective assistance of counsel. *Cauthern v. State*, 145 S.W.3d 571, 598 (Tenn. Crim. App. 2004) (citation omitted). When a petitioner claims he received ineffective assistance of counsel, he has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel applied in federal cases also applies in Tennessee). The *Strickland* standard is a two-prong test:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient

performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). With regard to the standard, our supreme court has held:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence . . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

*Finch v. State*, 226 S.W.3d 307, 315-16 (Tenn. 2007) (quoting *Baxter*, 523 S.W.2d at 934-35).

When reviewing trial counsel's performance, this Court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689). The fact that a trial strategy or tactic failed or was detrimental to the defense does not, alone, support a claim for ineffective assistance of counsel. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is given to sound tactical decisions made after adequate preparation for the case. *Id.*

To satisfy the prejudice prong of the test, the petitioner "must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different." *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 694). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). In order to prevail, the deficient performance must have been of such magnitude that the petitioner was deprived of a fair trial and that the reliability of the outcome was called into question. *Finch*, 226 S.W.3d at 316.

Courts need not approach the *Strickland* test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; *see also Goad*, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

As found by the post-conviction court and argued by the State in its brief to this Court, the petitioner failed to offer any proof in support of his claims. More specifically, the petitioner failed to present a witness that could have offered testimony exonerating him, failed to present an expert to refute the State's medical proof, and failed to present any proof in support of his claim that he was not competent to stand trial. When a petitioner contends trial counsel failed to discover, interview, or present witnesses in support of his defense, the petitioner must call those witnesses to testify at an evidentiary hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). This is the only way the petitioner can establish that:

> (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of Petitioner.

*Id.* Even if a petitioner is able to show counsel was deficient in the investigation of the facts or the calling of a known witness, the petitioner is not entitled to post-conviction relief unless he produces a material witness at his post-conviction evidentiary hearing who "could have been found by a reasonable investigation" and "would have testified favorably in support of his defense if called." *Id.* at 758. Without doing this, the petitioner cannot establish the prejudice requirement of the two-prong *Strickland* test. *Id.*

Here, the petitioner failed to offer any proof in support of his claim that counsel was ineffective. Other than calling trial counsel and questioning him about the decisions he made not to hire an investigator, not to hire an expert, and not to have the petitioner evaluated, the petitioner failed to call a single witness, including himself, to contradict trial counsel's testimony. Thus, even if one were to conclude trial counsel was deficient, the petitioner failed to present any witnesses or evidence showing he was prejudiced by trial counsel's actions, and we will not speculate as to what those witnesses would have said if called to testify at trial. *See Black*, 794 S.W.2d at 757. Accordingly, the petitioner has not established either deficiency or prejudice.

- 9 -

## CONCLUSION

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE